NOT FOR PUBLICATION

# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

ALLA THOMPSON,                          :
as Administratrix ad Prosequendum       :
of the Estate of PETER MICHAEL          :
THOMPSON, JR, Deceased,                 :
ALLA THOMPSON, Individually,            :
and PETER MICHAEL                       :
THOMPSON, SR,                           :
                                        :
          Plaintiffs,                   :          Civil Action No. 09-00926 (JAP)
                                        :
     v.                                 :          **OPINION**
                                        :
ROBERT WOOD JOHNSON                     :
UNIVERSITY HOSPITAL, et al.,            :
                                        :
          Defendants.                   :

PISANO, District Judge.

This action is brought by plaintiffs Alla Thompson, as Administratrix ad Prosequendum of the Estate of Peter Michael Thompson, Jr. and individually ("Alla Thompson"), and Peter Michael Thompson, Sr. ("Peter Thompson" and, together with Alla Thompson, "Plaintiffs") against defendants Robert Wood Johnson University Hospital ("RWJ"), University of Medicine and Dentistry of New Jersey ("UMDNJ"), Billie Fyfe-Kirschner, M.D. ("Dr. Fyfe-Kirschner") and Michael Nagar, M.D. ("Dr. Nagar"). Presently before the Court are motions for summary judgment by RWJ, Dr. Fyfe-Kirschner, UMDNJ and Dr. Nagar (the "Moving Defendants"). Plaintiffs oppose the motions. Oral argument was held on May 10, 2011. For the reasons set

forth herein, the motions for summary judgment by UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar are granted and the motion for summary judgment by RWJ is denied.

## I.      FACTUAL BACKGROUND

Plaintiffs filed the complaint in this case in connection with an autopsy performed on the body of their deceased child following their elective termination of Alla Thompson's pregnancy. The claims in this action are for compensatory damages arising out of the unauthorized autopsy of the body of the deceased child.  Plaintiffs' complaint asserts claims under the United States Constitution pursuant to 42 U.S.C. § 1983 for violation of their civil rights and under New Jersey state law.

During Alla Thompson's pregnancy in 2007, doctors at RWJ diagnosed the child she was carrying with skeletal dysplasia and holoprosencephaly, which are fatal fetal abnormalities. (Alla Thompson Deposition ("Dep."), 15:23 – 16:24).   Based on this diagnosis and after discussing their medical options with doctors and genetics counselors at RWJ, Plaintiffs elected to terminate the pregnancy shortly before the 24 week mark.  (Id. at 16:25 – 18:4; 30:23 – 31:1). While meeting with genetics counselors in connection with this diagnosis, Plaintiffs were presented with the option of participating in research on skeletal dysplasia conducted by the International Skeletal Dysplasia Registry at Cedars-Sinai Medical Center in Los Angeles, California ("Cedars-Sinai").  (Peter Thompson Dep., 15:1 – 20).  Participating in this research would require that an autopsy be performed on the body of their deceased child.   (Alla Thompson Dep., 23:10 – 24: 12).  Plaintiffs declined to give their consent for an autopsy, but verbally consented to the taking of x-rays.  (Id. at 34:21 – 36:12; 38:23 – 45:11; Peter Thompson Dep., 15:21 - 24).

2

On and about August 17, 2007, Alla Thompson underwent cardiocentesis, induction of labor and delivery of the body of her now-deceased child at RWJ.  (Alla Thompson Dep., 30:23 – 31:23).  On that day, prior to delivery of the body, Alla Thompson told members of the RWJ team that she did not want an autopsy performed on the body.  (Id. at 34:21 – 36:12; 41:23 – 42:6; 44:2 – 45:11).

Following Alla Thompson's delivery of the body, the remains were taken to the Pathology Department at RWJ.  (Dr. Nagar Dep., 29:3 - 6).  Dr. Nagar was a medical resident in the pathology residency training program at UMDNJ and was on duty that day.  (Dr. Nagar Dep., 14:2 – 6).  Dr. Fyfe-Kirschner was the director of that program.  (Dr. Fyfe-Kirschner Dep., 15:24 – 17:4).  Although they were working at RWJ, Dr. Fyfe-Kirschner and Dr. Nagar were employed by UMDNJ.  (Dr. Fyfe-Kirschner Dep., 16:9 – 12, 14:13 – 16; Dr. Nagar Dep., 13:11 – 14:6).

There are no documents in the record authorizing release of the body to Cedars-Sinai or consenting to an autopsy of the body.  (Dr. Fyfe-Kirschner Dep, 21:22 – 22:12).  Despite this lack of written consent, Dr. Nagar sent the remains to Cedars-Sinai for "complete evaluation."[1] (Robert Wood Johnson University Hospital Autopsy Report; Dr. Nagar Dep., 29:7 - 12).  According to Dr. Nagar, he sent the body to Cedars-Sinai based on his belief that it had specialized equipment to perform x-rays that could not be done at RWJ and consent had been obtained for doing so.  (Dr. Nagar Dep., 32:20 – 25).  A full autopsy was performed on the body after it arrived at Cedars-Sinai.

Beginning in the fall of 2007, Ms. Samantha Swanson ("Ms. Swanson"), a therapist, counseled Peter Thompson concerning the loss and autopsy of his deceased child.  (Ms. Swanson Dep., 20:1 - 6).  The medical records from Peter Thompson's first appointment indicate that he

---

[1]      Dr. Fyfe-Kirschner testified that a "complete evaluation" means that the body was being sent to Cedars-Sinai for a full autopsy.  (Dr. Fyfe-Kirschner Dep., 61:21 – 62:5).

initially complained of intense anger and rage, poor concentration, images and feelings of failure and helplessness.  (Id. at 21:15 – 18).   Ms. Swanson testified that she first diagnosed Peter Thompson with major depression or an adjustment disorder.  (Id. at 23:9 – 13).  Ms. Swanson testified that, by the final appointment in the fall of 2009, her diagnosis of Peter Thompson would have been that he was still suffering from an adjustment disorder, which included symptoms of guilt, regret and some marital discord.  (Id. at 34:13 – 17).

Beginning in late spring of 2008, Ms. Swanson also began counseling Alla Thompson. (Id. at 35:22 - 25).  The medical records from Alla Thompson's initial appointment state that she complained of decreased appetite, sleep issues, obsessive thoughts, anhedonia, daily weeping and poor coping.  (Id. at 36:3 – 8).  Ms. Swanson diagnosed Alla Thompson with "major depression" and suggested that she begin taking medication to help with her symptoms.  (Id. at 36:17 – 37:2).  Ms. Swanson testified that, by the final appointment in the fall of 2009, her diagnosis of Alla Thompson could have changed to "major depression mild" because she had been able to return to work and was functioning better.  (Id. at 48:18 – 23).  Ms. Swanson also noted, however, that Alla Thompson was still upset because the issue wasn't resolved in her mind and it was affecting their marriage.  (Id. at 48:18 - 23).

Dr. Grigory Rasin, M.D. ("Dr. Rasin") examined Alla Thompson on August 17, 2010. (Dr. Rasin Medical Report, Alla Thompson).  Dr. Rasin's medical report states that Alla Thompson complained that she was not as happy has she used to be in the past and that her outlook was not as optimistic as it used to be.  She had lost interest in her usual activities, lost weight and had a feeling and expectation that something bad was going to happen.  She also reported that she suffered from problems with memory and concentration.  Dr. Rasin noted that Alla Thompson looked depressed, that her train of thought was depressive and that she admitted

4

to symptoms of depression.   He also reported that Alla Thompson's anxiety was vivid. Following Dr. Rasin's psychiatric evaluation, Alla Thompson underwent psychological testing MCMI-III.  The results of this test suggested that Alla Thompson might suffer from "generalized anxiety disorder and adjustment disorder with depressed mood."   Based on this report and his own examination, Dr. Rasin diagnosed Alla Thompson with moderate major depressive disorder and generalized anxiety disorder, both of which were permanent in nature.

Dr. Rasin also examined Peter Thompson on August 17, 2010.  (Dr. Rasin Medical Report, Peter Thompson).  The medical report indicates that Peter Thompson's condition had improved over the period of time since the incident first occurred.  He was able to focus at work and had stopped having nightmares.  However, Peter Thompson reported that he was still very angry about his son and mistrustful of medical professionals.  He stated that he was constantly apprehensive and concerned about his children's health.  Dr. Rasin noted that Peter Thompson appeared to be very anxious, very tense, irritable and somewhat depressed.  He also had a hard time controlling his emotions and was emotional when talking about the effect of the incident on his marriage.  Dr. Rasin also noted that he suffered from elements of self-blame regarding the incident.    Following  Dr. Rasin's  psychiatric  evaluation,  Peter  Thompson  underwent psychological testing MCMI-III.  The results of this test produced no suggestion of clinical syndrome.  Dr. Rasin diagnosed Peter Thompson with permanent post-traumatic stress disorder and residual, chronic and generalized anxiety disorder.

Plaintiffs filed the complaint in this action on March 2, 2009.  Count I of the complaint alleges that UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar violated Plaintiffs' due process rights under the Fourteenth Amendment of the United States Constitution by depriving Plaintiffs of their rights over the remains of the body, including their right to control the funeral and

disposition of the remains in that they (1) failed to properly train and supervise their agents, employees and personnel on the proper procedure for obtaining consent for autopsy, obtaining consent to participation in medical research and otherwise failing to observe the rights of Plaintiffs to control the funeral and disposition of remains for purpose of preservation and burial; (2) arranged for delivery of the remains to Cedars-Sinai; (3) failed to obtain proper and appropriate informed consent to conduct an autopsy on the remains; and (4) willfully obstructed Plaintiffs' good-faith efforts to assert their rights over the remains of their deceased child.  Count II of the complaint alleges that the Moving Defendants violated Plaintiffs' proper burial rights under N.J.S.A. § 45:27 – 22[2].  Count III of the complaint claims that UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar violated Alla Thompson's rights under the First and Fourteenth Amendments of the United States Constitution by substantially burdening her religious free exercise rights without a showing of a compelling governmental interest.  Count IV of the complaint alleges that the Moving Defendants breached a duty of care owed to Plaintiffs in that they (1) failed to properly train and supervise their agents, employees and personnel on the proper procedure for obtaining consent for autopsy, obtaining consent to participation in medical research and otherwise failing to observe the rights of Plaintiffs to control the funeral and disposition of remains for purpose of preservation and burial; (2) arranged for delivery of the remains to Cedars-Sinai; and (3) failed to obtain proper and appropriate informed consent to conduct an autopsy on the remains.  Finally, Count V of the complaint alleges that the Moving

---

[2]      N.J.S.A. § 45:27 – 22 governs the rights of next of kin to determine a decedent's final burial place and the conduct of cemeteries in general.  Plaintiffs' counsel has conceded that N.J.S.A. § 45:27 – 22 does not create a cause of action that is applicable under the facts of this case and acknowledged that this statutory section was cited in support of the proposition that Plaintiffs have a next of kin property right in the remains of their deceased child for purposes of their constitutional claims.  Because N.J.S.A. § 45:27 – 22 cannot serve as the foundation for a cause of action under these facts, count II of the complaint is dismissed.

Defendants negligently, carelessly and recklessly inflicted upon the Plaintiffs severe emotional distress, humiliation and embarrassment.

Plaintiffs claim that they suffer from "anxiety, depression and mental anguish, as well as mental and emotional distress." (Complaint, Count I, ¶ 6, Count II, ¶ 4, Count III, ¶ 4, Count IV, ¶ 2). In addition, Plaintiffs allege that they suffer "severe and permanent injury" and have been unable "to enjoy and pursue their usual occupation, business, and personal pursuits." (Count IV, ¶ 3, Count V, ¶ 3). Finally, Plaintiffs claim that they experience "severe emotional distress, humiliation and embarrassment." (Count V, ¶ 2).

## II.   SUMMARY JUDGMENT STANDARD

A court shall grant summary judgment under Rule 56 of the Federal Rules of Civil Procedure "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A material fact raises a genuine dispute "if the evidence is such that a reasonable jury could return a verdict" for the non-moving party. *Healy v. N.Y. Life Ins. Co.*, 860 F.2d 1209, 1219 n.3 (3d Cir. 1988).

On a summary judgment motion, the moving party must show, first, that no genuine dispute of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party makes this showing, the burden shifts to the non-moving party to present evidence that a genuine fact dispute compels a trial. *Id.* at 324. The non-moving party must offer admissible evidence that establishes a genuine dispute of material fact, *id.*, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). If the non-moving party fails to respond to the moving party's

assertion of fact, the court may "consider the fact undisputed for purposes of the motion." Fed. R. Civ. P. 56(e)(2). The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need determine only whether a genuine dispute necessitates a trial. *Anderson*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine dispute of material fact exists, then the Court must grant summary judgment. *Big Apple BMW v. BMW of North America*, 974 F.2d 1358, 1363 (3d Cir. 1992).

### III.   LEGAL ANALYSIS

#### A.   Constitutional Claims

Counts I and III of the complaint assert claims against UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar under the United States Constitution pursuant to 42 U.S.C. § 1983. This section does not create any substantive rights, but instead provides a remedy for violations of rights conferred in the Constitution or other federal statutes. *Doe v. Delie*, 257 F.3d 309, 314 (3d Cir. 2001) (citing *Baker v. McCollan*, 443 U.S. 137, 144 n. 3 (1979)). In order to state a cause of action under § 1983, a plaintiff must allege two elements: (1) a violation of a right secured by the Constitution or federal law; and (2) that the violation of that right was committed by a person acting under the color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988). In this case, Plaintiffs allege that UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar, acting under color of state law, violated (1) Plaintiffs' due process rights under the Fourteenth Amendment of the United States Constitution by depriving them of their rights over the remains, including their right to control the funeral and disposition of those remains and (2) Alla Thompson's free exercise rights under the First and Fourteenth Amendments of the United States Constitution by substantially

burdening her religious free exercise rights without a showing of a compelling governmental interest.

    1.   <u>Persons Acting Under Color Of State Law</u>.

      Dr. Fyfe-Kirschner and Dr. Nagar argue that they cannot be held liable for violating Plaintiffs' constitutional rights under § 1983 because they were not acting under "color of state law" at the time the alleged conduct occurred. As discussed above, to state a valid claim under § 1983, a plaintiff must show not only that the defendants violated their federal rights, but that the defendants did so while acting under color of state law. *Groman v. Twp. of Manalapan,* 47 F.3d 628, 638 (3d Cir. 1995). "The color of state law analysis . . . is grounded in a basic and clear requirement, 'that the defendant in a § 1983 action have exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.' " *Id*. at 638 (quoting *West,* 487 U.S. at 49). "The issue is not whether the state was involved in some way in the relevant events, but whether the action taken can be fairly attributed to the state itself." *Groman*, 47 F.3d at 638 (citing *Jackson v. Metropolitan Edison Co.,* 419 U.S. 345, 351 (1974)). "It is clear that under 'color' of law means under 'pretense' of law." *Screws v. United States*, 325 U.S. 91, 111 (1945). No single method of analysis determines the presence of state action in § 1983 cases. *Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94, 98 (3d Cir. 1984). Instead, the analysis depends on the facts and circumstances of each case. *Burton v. Wilmington Parking Authority*, 365 U.S. 715, 722 (1961). The Court finds that Dr. Fyfe-Kirschner and Dr. Nagar were not acting under color of state law when the conduct in this case occurred. "Although 'state employment is generally sufficient to render the defendant a state actor,' not all torts committed by state employees constitute state action, even if committed while on duty." *Bonenberger v. Plymouth Twp.*, 132 F.3d 20, 24 (3d Cir. 1997) (citing *West,* 487 U.S. at 50)).

There is no evidence that Dr. Fyfe-Kirschner or Dr. Nagar were acting under pretense of law or according to official power.  Nor is there any indication that they abused a power or position possessed by virtue of state law and made possible only because they were clothed with the authority of state law.  Although employed by a public entity, Dr. Fyfe-Kirschner and Dr. Nagar were acting as private doctors in connection with medical care sought by private individuals at RWJ.  *See Polk County v. Dodson*, 454 U.S. 312 (1981) (public defender did not act under color of state law when he performed a function indistinguishable from that provided by a private attorney); *but see West v. Atkins*, 487 U.S. 42 (1988) (doctor who was under contract with the state to provide medical services was acting under color of state law when treating prisoner); *O'Connor v. Donaldson*, 422 U.S. 563 (1975) (psychiatrist who was also administrator of a state mental health facility acting under color of state law when treating prisoner); *Estelle v. Gamble*, 429 U.S. 97 (1970) (doctor who was also chief medical officer at the prison hospital acting under color of state law when treating prisoner).  The Court finds that no reasonable jury could attribute Dr. Fyfe-Kirschner or Dr. Nagar's actions to the state itself or consider the medical services they provided as having been provided by the state; therefore, they cannot be held liable for violating Plaintiffs' constitutional rights.

UMDNJ argues that it cannot be held liable for violating Plaintiffs' constitutional rights because Plaintiffs have not established the limited circumstances under which public entities can be held liable under § 1983.  A public entity cannot be held responsible for violating Plaintiffs' constitutional rights based on the acts of its employees under a theory of respondeat superior or vicarious liability.  *See Monell v. New York City Dept. of Soc. Servs.,* 436 U.S. 658, 691 (1978); *Natale v. Camden County Correctional Facility*, 318 F.3d 575, 583 (3d Cir. 2003).  However, a public entity can be liable if a plaintiff provides evidence that it established a policy or custom

that caused the constitutional violations they allege. *Monell*, 436 U.S. at 691; *Natale*, 318 F.3d at 583 – 584.

Not all state action rises to the level of a custom or policy. A policy is made "when a 'decisionmaker possess[ing] final authority to establish municipal policy with respect to the action' issues a final proclamation, policy or edict." *Kneipp v. Tedder,* 95 F.3d 1199, 1212 (3d Cir. 1996) (quoting *Pembaur v. City of Cincinnati,* 475 U.S. 469, 481 (1986) (plurality opinion)). A custom is an act "that has not been formally approved by an appropriate decisionmaker," but that is "so widespread as to have the force of law." *Board of County Com'rs of Bryan County, Okl. v. Brown*, 520 U.S. 397, 404 (1997). In the present case, Plaintiffs do not argue that the UMDNJ established a policy or custom of failing to obtain consent of parents when handling the remains of a dead fetus. In fact, Plaintiffs concede that UMDNJ has "policies and procedures to ensure that proper consent is obtained from next of kin prior to the performance of an autopsy or participation in medical research. . . " (Complaint, Facts, ¶ 42).

Instead, Plaintiffs have argued that UMDNJ failed to exercise adequate supervision and failed to properly train their employees on the process of obtaining consent from parents when handling the remains of a dead fetus or still-born child. The Supreme Court has held that the failure to train or supervise "may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of person with whom the [public employees] come into contact." *City of Canton, Ohio v. Harris*, 489 U.S. 378, 388 (1989). A plaintiff may establish deliberate indifference by demonstrating that a policy maker "has failed to act affirmatively at all, [though] the need to take some action to control the agents of the government is so obvious, and the inadequacy of existing practice so likely to result in the violation of constitutional rights, that the policymaker can reasonably be said to have been deliberately

11

indifferent to the need." *Natale*, 318 F.3d at 584 (quoting *Bryan County*, 520 U.S. at 417 – 418). For example, "[a] municipality's failure to train its police officers can subject it to liability . . . 'only where [it] reflects a 'deliberate' or 'conscious' choice by [the] municipality'." *Muhlenberg*, 269 F.3d at 215 (citing *City of Canton*, 489 U.S. at 388).   In this case, however, Plaintiffs have offered no evidence showing a conscious choice by UMDNJ to fail to train its employees on the appropriate process to obtain consent from parents when handling the remains of a dead fetus or still-born child.  To the contrary, UMDNJ has come forward with evidence tending to show that its employees were trained to get consent in order to perform an autopsy.  (Nagar Deposition, 15:16 – 16:18; 53:16 – 24).   Plaintiffs have not offered any evidence showing that the existing practice was obviously likely to result in the violation of constitutional rights.   Therefore, the Court finds that no reasonable juror could determine that UMDNJ made a deliberate choice to fail to train its employees on the proper method to obtain consent from parents when handling the remains of a still-born fetus.

2.   <u>Constitutional Violations</u>

Even if Plaintiffs could establish that UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar were persons acting under color of law for purposes of § 1983, the Court finds that Plaintiffs have nonetheless failed to establish sufficient evidence to support their civil rights claims.  In Count I of the complaint, Plaintiffs argue that UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar violated their due process rights under the Fourteenth Amendment of the United States Constitution by depriving Plaintiffs of their rights over the remains, including their right to control the funeral and disposition of the remains.  But, not every tort by a state official acting under color of state law is a constitutional violation.  *Paul v. Davis*, 424 U.S. 693, 699 (1976).  Even assuming that UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar were persons acting under color of law and

assuming that New Jersey state law recognizes a property right in the remains of next-of-kin sufficient to find a constitutional due process interest in the remains of next-of-kin based in state law[3], the Court finds that the conduct alleged in this case is insufficient to establish a violation of Plaintiffs' constitutional rights.

The Supreme Court has held that allegations of negligence are insufficient to show a deprivation of due process in a § 1983 case.  *Daniels v. Williams*, 474 U.S. 327, 330 - 331 (1986).  Instead, a plaintiff wishing to establish a denial of due process must show an intentional deprivation or at least a reckless government action.  *Id*.  According to the Third Circuit, it is clear that "an intentional violation of a right protected by the Due Process Clause is within the reach of § 1983" and "that mere negligence is insufficient to make out a claim."  *Fagan v. City of Vineland*, 22 F.3d 1296, 1310 (3d Cir. 1994).  Although Plaintiffs have alleged intentional and willful conduct on the part of UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar in their complaint and during oral argument, they have offered no evidence in support of such allegations.  Without evidence showing more than negligence on the part of UMDNJ, Dr. Fyfe-Kirschner or Dr. Nagar, the Court finds that no reasonable juror could find that they engaged in conduct sufficient to establish a violation of Plaintiffs' due process rights under § 1983.

In Count III of the complaint, Alla Thompson alleges that the actions of UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar violated her rights under the First and Fourteenth Amendments. In support, Plaintiffs rely on *Church of Lukumi Babalu Aye, Inc. v. City of Haileah*, 508 U.S. 520

---

[3]     The Sixth and the Ninth Circuits have found a constitutional due process interest in the remains of next-of-kin based in state law.  *See Brotherton v. Cleveland*, 923 F.2d 477 (6th Cir. 1991); *Whaley v. County of Tuscola*, 58 F.3d 1111 (6th Cir. 1995); *Newman v. Sathyavaglswaran*, 287 F.3d 786 (9th Cir. 2002).   Both the Sixth and Ninth Circuits relied on *Board of Regents v. Roth*, 408 U.S. 564 (1972) where the Supreme Court explained that the property interests protected by procedural due process "are created and their dimensions are defined by existing rules or understandings that stem from an independent sources such as state law-rules or understandings that secure certain benefits and that support claims of entitlement to those benefits." *Id*. at 571 – 572.  The Third Circuit has not addressed the issue of whether there is a constitutional due process interest in the remains of next-of-kin based on New Jersey state law and this Court finds it unnecessary to do so at this time.

(1993).  Alla Thompson claims that the autopsy performed at Cedars-Sinai violated her beliefs in the Jewish faith.   Thus, Alla Thompson's free exercise clause claim appears to be that, by shipping the body to Cedars-Sinai for autopsy and by failing to train employees on the proper method of obtaining consent for fetal autopsy, UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar disrespected her religious beliefs and obstructed her ability to practice her religion.

The free exercise clause of the First Amendment provides that Congress "shall make no law … prohibiting the free exercise [of religion]".  U.S. Const. Amend. I.   In discussing the free exercise clause, the Supreme Court has emphasized the "distinction between the absolute constitutional protection against governmental regulation of religious beliefs on the one hand, and the qualified protection against the regulation of religiously motive conduct."  *Employment Division v. Smith*, 485 U.S. 660, 670 n.13 (1990).  In *Church of Lukumi Babalu*, the only case relied on by Alla Thompson, the Supreme Court considered an ordinance prohibiting the killing of animals for a ritual purpose.  508 U.S. at 526 - 528  The Supreme Court stated that "a law that is neutral and of general applicability need not be justified by a compelling governmental interest even if the law has the incidental effect of burdening a particular religious practice."  *Id*. at 531 (citing *Employment Division*, 485 U.S. 660).  The Supreme Court then went on to hold that the ordinance was unconstitutional because (1) it was not neutral -- its clear object was to prohibit a religious practice and (2) it was not generally applicable -- only applied to animal killings for ritual purposes.  *Church of Lukumi Babalu*, 508 U.S.at 542 and 546.  Thus, the Supreme Court made clear that the motivation behind a challenged government action is key to determining whether a constitutional violation has occurred.[4]

---

[4]    The Court notes that *Church of Lukumi Babalu* is not directly applicable under these circumstances, given that there is no law or regulation or ordinance to examine in this case.  Alla Thompson has failed to point to, nor can the Court identify, any authority establishing a standard for determining whether a government action that is not dictated by a law, ordinance or regulation violates a plaintiff's rights under the free exercise clause.

Even assuming that Dr. Fyfe-Kirschner and Dr. Nagar were acting under color of law, Alla Thompson has made no allegation or presented any evidence to show that their motivation in shipping the body to Cedars-Sinai was to infringe on her religious sensibilities in any way. Further, assuming that UMDNJ had a policy or custom that caused the body to be shipped to Cedars-Sinai, Alla Thompson has failed to allege or present any evidence to show that the motivation behind that policy or custom was to burden a particular religious practice. Although it is arguable that Alla Thompson's ability to exercise her religious beliefs was disturbed by the conduct alleged in this case, without evidence showing some motivation relating to Alla Thompson's religion, the Court finds that UMDNJ, Dr. Fyfe-Kirschner or Dr. Nagar could not have engaged in conduct sufficient to establish a violation of her free exercise clause rights.

B.      State Law Claims

The remainder of Plaintiffs' complaint states claims against the Moving Defendants under New Jersey state law. Count IV of the complaint alleges that the Moving Defendants breached a duty of care owed to Plaintiffs in that they (1) failed to properly train and supervise their agents, employees, and personnel on the proper procedure for obtaining consent for autopsy, obtaining consent to participation in medical research and otherwise failing to observe the rights of Plaintiffs to control the funeral and disposition of remains for purpose of preservation and burial; (2) arranged for delivery of the remains to Cedars-Sinai; and (3) failed to obtain proper and appropriate informed consent to conduct an autopsy on the remains. Count V of the complaint alleges that the Moving Defendants negligently, carelessly and recklessly inflicted upon the Plaintiffs severe emotional distress, humiliation and embarrassment.

1.      <u>Tort Claims Act</u>.

UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar move for summary judgment on the ground that Plaintiffs are barred from recovery against them by the New Jersey Tort Claims Act (the "<u>Tort Claims Act</u>" or the "<u>Act</u>") which sets forth the following limitation on the recovery of pain and suffering damages:

> No damages shall be awarded against a public entity or public employee for pain and suffering resulting from any injury; provided, however, that this limitation shall not apply in cases of permanent loss of a bodily function, permanent disfigurement or dismemberment where the medical treatment expenses are in excess of $3,600.00.

N.J.S.A. 59:9-2(d).   The parties agree that the Tort Claims Act applies to Plaintiffs' state law claims against UMDNJ, because it is a public entity, and Dr. Fyfe-Kirschner and Dr. Nagar, because they are public employees.  (Plaintiffs' Opposition Briefs at 20).   Thus, although the Court finds that UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar were not "persons acting under color of state law" for purposes of Plaintiffs' constitutional claims, New Jersey state law automatically protects them from liability for pain and suffering damages that do not cross the threshold described in N.J.S.A. 59:9-2(d).  This statutory liability must be read in light of the general legislative intent in the Tort Claims Act to establish immunity as the general rule and liability as the exception.  *Brooks v. Odom*, 150 N.J. 395, 401 – 402 (1997); *Collins v. Union County Jail*, 150 N.J. 407, 413 (1997).  The Comment to this section describes the limitation on damages as reflecting "the policy judgment that in view of the economic burdens presently facing public entities a claimant should not be reimbursed for non-objective types of damages, such as pain and suffering, except in aggravated circumstances …"  Comment, N.J.S.A. 59:9-2. In interpreting this statutory limitation, the New Jersey Supreme Court has developed the following two-part test for recovery of such damages: a plaintiff must prove (1) an objective permanent injury and (2) a permanent loss of a substantial bodily function.  *Kahrar v. Borough*

*of Wallington*, 171 N.J. 3, 12 (2002); *Gilhooley v. County of Union*, 164 N.J. 533, 541 (2000);
*Brooks*, 150 N.J. at 403 – 406.

      Emotional distress or psychological harm can qualify as a "permanent loss of a bodily
function" when that harm is caused by an intentional or a negligent tort, as long as the
psychological injury is both permanent and substantial.   *Willis v. Ashby*, 353 N.J. Super. 104,
109 (App. Div. 2002) (citing *Collins*, 150 N.J. at 420 – 423).   In *Collins*, the plaintiff alleged
psychological injuries resulting from his rape by a prison guard.   150 N.J. at 409.   The New
Jersey Supreme Court found that the alleged debilitating psychological disorder resulting from
the rape constituted a "permanent loss of bodily function."   *Id*. at 420.   The Court then left it to
the trial court to "determine whether the severity of plaintiff's injuries could be characterized as
substantial."   *Id*. at 423.    In *Willis*, the plaintiffs claimed emotional and psychological injuries
from giving birth to a still-born baby caused by negligent medical care.   353 N.J. Super. at 104.
The Appellate Division found that the alleged emotional injuries resulting from the negligent
medical care constituted "permanent loss of bodily function."   *Id*. at 110.

      Plaintiffs have not established that their psychological claims amount to a "permanent
loss of bodily function " for which pain and suffering damages can be recovered under the Tort
Claims Act.   The Court finds that the labor and delivery of Alla Thompson's still-born baby
cannot constitute physical pain and suffering for purposes of Plaintiffs' claims in this case.   In
*Willis*, the Appellate Division held that labor and delivery of a still-born baby could constitute a
"permanent loss of a bodily function" for purposes of the Act and the emotional distress that
flowed from that still-birth could be compensated, so long as the plaintiffs proved that the
emotional injuries were both permanent and substantial.   353 N.J. Super. at 109.   However, in
that case, the plaintiffs alleged that medical malpractice caused the delivery of a stillborn baby.

*Id.* at 107.  Here, Plaintiffs underwent an elective termination of their pregnancy.  The Appellate Division in *Willis* sought to recognize a parent's loss from a "negligently-caused full-term still-born baby."  *Id.* at 112.  Here, Plaintiffs' emotional injuries derive from the autopsy performed on the body, not the still-birth.  Because Alla Thompson's labor and delivery of the still-born child did not cause the alleged emotional and psychological injuries, they cannot serve as the basis for the "permanent loss of bodily injury."

Plaintiffs have also failed to show sufficient evidence to establish a fact question about whether their psychological injuries are substantial within the meaning of the Tort Claims Act. In *Srebnik v. State*, 245 N.J. Super. 344 (App. Div. 1991), the plaintiff alleged emotional and psychological injuries in connection with her witnessing her husband's death following an automobile accident.  245 N.J.Super. at 347.  Plaintiff claimed to suffer from recurrent fear of dying, frequent nightmares, loneliness and depression.  *Id.*  The psychiatrist testified that plaintiff was "quite depressed", suffered flashbacks, night terrors and a sense of panic and diagnosed plaintiff with chronic post traumatic stress disorder that was permanent in nature.  *Id.*  The Appellate Division found that this expert evidence failed to establish that plaintiff was suffering from any physically disabling infirmity and that "the residua of the unfortunate emotional trauma constitute the intangible subjective symptoms of depression, stress and anxiety barred by the N.J.S.A. 59:9-2d."  *Id.* at 352.  In *Hammer v. Township of Livingston*, 318 N.J.Super 298 (App.Div. 1999), the plaintiff was diagnosed with post-traumatic stress disorder with severe phobic elements after having been struck by a red fire chief station wagon.  318 N.J.Super at 302.  The psychiatrist opined that plaintiff's condition appeared to be chronic and partially disabling and was characterized by anxiety and depression which fell into a mild range.  *Id.* at 302 – 303.  The Appellate Division found that, because the plaintiff's permanent psychological

injury was determined to be a mild level of anxiety and depression, it was insufficient to cross the threshold for recovery for pain and suffering under the Act. *Id*. at 307.   Finally, in *Rocco v. New Jersey Transit Rail Operations, Inc.*, 330 N.J. Super. 320 (App.Div. 2000), the plaintiff alleged emotional and psychological injuries after his hand became jammed between a railroad car's sliding door and its emergency unlock mechanism.   330 N.J. Super. at 331.   One psychiatrist diagnosed plaintiff with mood disorder secondary to his medical condition and probable post traumatic stress disorder.   *Id*.   Another psychiatrist found that plaintiff was severely depressed and totally disabled as a result of his injury.   *Id*.   A third psychiatrist found the plaintiff's depression as treatable and that plaintiff has resisted taking antidepressant medication that would have helped him.   *Id*.   The Appellate Division found that this expert evidence failed to disclose that plaintiff was suffering from a substantial permanent psychological injury.   *Id*. at 333 – 334.

The Court finds that Plaintiffs have not established a fact question on whether their psychological conditions are substantial.   Dr. Rasin diagnosed Alla Thompson with moderate major depressive disorder and generalized anxiety disorder and Peter Thompson with post-traumatic stress disorder and residual, chronic and generalized anxiety disorder, both of which are permanent in nature.   Neither Plaintiff experiences any physical infirmities as a result of their alleged psychological harm, nor do they take any medication due to such injury.   They have both returned to work.   The Tort Claims Act and the cases interpreting its limitation on the recovery of pain and suffering damages from a public entity or employee require that a plaintiff suffer from substantial emotional injuries.   Although Plaintiffs have offered evidence that their emotional injuries are permanent in nature, they have not shown that such injuries are substantial.

2.    <u>Apparent Authority</u>.

RWJ moves for summary judgment on Plaintiffs' state law claims on the grounds that it cannot be held liable for the negligence of UMDNJ or its employees because UMDNJ was an independent contractor and because Plaintiffs have not established facts that support a claim for vicarious liability based on apparent authority.  According to New Jersey law, "a principal is immune from liability for the negligence of 'an independent contractor, or that of its employees, in the performance of the contracted services.' "  *Codero ex rel. Cordero v. Christ Hospital*, 403 N.J. Super. 306, 312 (App.Div. 2008) (quoting *Basil v. Wolf*, 193 N.J. 38, 62 (2007)).  However, when a third party accepts the services of an independent contractor under the reasonable belief that the independent contractor had the authority to act on behalf of the principal and that belief was the result of the principal's actions, the principal can be held liable for that independent contractor's actions, even where he did not have actual authority to act.  *Basil*, 193 N.J. at 63 (citing *Arthur v. St. Peter's Hospital*, 169 N.J. Super 575, 581 (Law.Div. 1979)).

RWJ argues that apparent authority does not exist in this case because Plaintiffs did not accept Dr. Fyfe-Kirschner and Dr. Nagar's services under the reasonable belief that they were acting on behalf of RWJ.  Dr. Fyfe-Kirschner and Dr. Nagar were not employees of RWJ and were never presented to Plaintiffs as such.  However, the Appellate Division in *Codero* found that "when a hospital provides a doctor for a patient and the totality of the circumstances created by the hospital's action and inaction would lead a patient to reasonably believe the doctor's care is rendered in behalf of the hospital, the hospital has held out that doctor as its agent."  403 N.J. Super. at 310.  In discussing the role of specialized care in hospitals, such as emergency rooms, operating rooms and anesthesiology and radiology departments with which a patient has no prior or ongoing relationship, the Appellate Division found that "a patient, who has no choice or

reasonable means of soliciting information about the qualifications of such specialists, reasonably assumes the hospital furnishes the care rendered in its facility.  *Id.* at 316 (citations omitted).  In *Arthur*, the Superior Court found that a hospital could be held vicariously liable for the acts of the physicians in its radiology department, even though they were independent contractors, because the hospital staffed the department with those physicians and did not give the patient any notice that those physicians were not employees.  169 N.J. Super at 582 – 583.

The Court finds that Plaintiffs have shown sufficient evidence to withstand RWJ's motion for summary judgment on apparent authority.  Plaintiffs had no contact with Dr. Fyfe-Kirschner or Dr. Nagar prior to their providing specialized pathology care at RWJ.  There is no evidence that RWJ informed Plaintiffs that the pathology department at the hospital was contracted out to UMDNJ or that Plaintiffs were given an opportunity to select or reject the care provided in the pathology department.  Therefore, a juror could find that Plaintiffs formed a reasonable belief that the doctors in the pathology department were agents of RWJ.  Thus, the Court finds that there are issues of fact as to Counts IV and V of Plaintiffs' complaint against RWJ.

## IV.   CONCLUSION

For the reasons above, UMDNJ, Dr. Fyfe-Kirschner and Dr. Nagar's motions for summary judgment are granted and RWJ's motion for summary judgment is denied.  An appropriate Order accompanies this Opinion.

/s/ JOEL A. PISANO
United States District Judge

Dated: June 15, 2011